■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVID LANE, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Kings County (Scholnick, J.), rendered March 26, 1981, convicting him of robbery in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of a motion to suppress out-of-court identifications of defendant. ¶ Judgment reversed, on the law and the facts, motion to suppress out-of-court identifications granted, and new trial ordered. ¶ On July 1, 1980, at approximately 2:00 P.M., Meyer Muskin, an 87-year-old man, was walking home from a senior citizen's center. On East 16th Street, between Ditmas and Dorchester Avenues in Brooklyn, two teenagers grabbed Muskin from behind. After a struggle, one of the teenagers faced Muskin and punched him in the jaw. Muskin fell face down to the ground. At this point, one of the teenagers grabbed Muskin's wallet and the teenagers ran away. Four one dollar bills were taken from Mr. Muskin. ¶ The police arrived a few minutes after the incident. Muskin described his assailants as "two male blacks, sixteen to eighteen. One was tall and one was short, and they were wearing dark tee shirts * * * blue jeans." A police officer also talked to an eyewitness, Dawn De Falco. De Falco was walking home from her job for lunch, when she noticed the teenagers across the street walking very slowly behind Muskin. She was suspicious and watched the boys for several minutes as she walked to her house. At one point she stared at one of the boys for about 30 seconds and he stared back. As De Falco turned away from the boys to enter her house, she heard a scream. When she turned back, she saw Muskin on the ground and the teenagers running away. De Falco gave the same general description to the police as Muskin, but she added that one boy was five feet,

eight inches tall, and the other was about five feet tall. ¶ An officer put this description over a police radio and received a report from another precinct stating that two males fitting the description were in the area of 21st Street and Glenwood Road, approximately 10 blocks from the scene of the crime. An elderly woman who overheard the radio report, told the officers that she saw two youths running from the area and suggested that she might be able to identify them. The officers took the woman with them to 21st Street. ¶ At 21st Street an officer saw three young men standing around a stoop, one of whom was the defendant. The defendant was about five feet, eight inches tall and was wearing a black tee shirt, dark brown knit pants and a brown hat. Another boy was wearing a blue sweat shirt. Although this boy was shorter than defendant, the record indicates that his height was about five feet, six inches. The woman could not identify these boys as the ones she saw running. ¶ An officer approached the boys and asked them if they were on East 16th Street earlier that day. They replied "No, never". He then asked them if they had committed a robbery, to which they replied in the negative. The officer then placed the two suspects into a patrol car. He did not handcuff them or read them their rights. The suspects were transported back to the scene of the crime and while they were seated in the patrol car, Muskin and De Falco identified them as the robbers. At about 2:40 P.M., defendant and the other boy were arrested. After a search, only a $20 bill was found on defendant's person. ¶ At defendant's *Wade* hearing, his counsel argued that defendant's "seizure" at 21st Street was, in effect, an arrest and that the police had no probable cause to arrest him. Defense counsel also stated that the showup was suggestive. Criminal Term ruled that there was probable cause, and considering all the circumstances, the showup was not violative of the defendant's due process rights. The court ruled further that even if it had held the showup to be tainted, the witnesses still established sufficient independent sources for their in-court identifications of the defendant. At trial, evidence of the showup was presented to the jury and the showup was mentioned by the prosecutor in his summation. ¶ Although the police had a sufficient basis for detaining the defendant at 21st Street for the purpose of conducting an investigation and asking him pertinent questions (*Terry v Ohio,* 392 US 1), that minimal intrusion on his liberty, or brief detention for investigative purposes, ripened into an arrest, under the facts and circumstances of this case, when defendant was placed in the police car and taken 10 blocks back to the scene of the crime without his consent (see *Florida v Royer,* 103 S Ct 1319). While it is true that he was not told that he was under arrest, it goes without saying that he would have been physically restrained if he had attempted to leave the police car at the time (*Dunaway v New York,* 442 US 200). "Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment * * * This is true whether a person submits to the authority of a badge or whether he succumbs to force" (*People v Cantor,* 36 NY2d 106, 111). ¶ The issue which necessarily arises is whether there was probable cause to effect the arrest at 21st Street. The existence of probable cause depends on whether it appeared more probable than not that a crime had been committed and that the defendants were its perpetrators (*People v Gordon,* 87 AD2d 636). Herein, while the arresting officers had probable cause to believe that a crime had been committed, under the facts of this case no such cause existed to believe that defendant had been one of the perpetrators. When the officers first viewed defendant he was with two other boys standing around a stoop. Their behavior far from suggested any criminal activity. Upon questioning, the boys denied being at the scene of the crime or committing a robbery. A woman who claimed to have seen two boys running in the area

could not identify these boys as the ones she saw running. The only remaining possible basis for the arrest was the descriptions given by the complainant and De Falco of two black males, 16 to 18 years of age, one five feet, eight inches tall, the other five feet tall, both wearing dark tee shirts and blue jeans. As noted above, within minutes after the crime, the defendant was approached by the police officer some 10 blocks from the crime scene and he was wearing brown pants and a brown hat. A second boy present at the stoop was not only dressed in a blue sweat shirt, but also was some six inches taller than the boy described by De Falco. In a word, the somewhat vague, general description given by the victim and eyewitness failed to establish probable cause to arrest the defendant (*People v Gordon, supra;* cf. *People v Brnja,* 50 NY2d 366, 372). ¶ Having found that the defendant's arrest was illegal we must now determine what import, if any, the arrest had upon the showup or in-court identifications of the defendant by Muskin and De Falco. As a general rule, showups are condemned as inherently suggestive (*Stovall v Denno,* 388 US 293). Ordinarily a recognized exception to that rule exists for prompt on-the-scene showups such as the one at bar (*People v Brnja, supra; People v Smith,* 38 NY2d 882; *People v Digiosaffatte,* 63 AD2d 703). However, since the instant showup followed the illegal arrest almost immediately and was the direct result thereof, evidence of the showup should have been suppressed and not admitted at trial due to the "fruit of the poisonous tree" doctrine (*United States v Crews,* 445 US 463; *Dunaway v New York, supra; Wong Sun v United States,* 371 US 471; *People v Gordon, supra*). ¶ Although we conclude that the illegal arrest mandates suppression of the showup, the record indicates that the in-court identifications of defendant by Muskin and De Falco are supported by independent sources not related to the illegal arrest (i.e., their observations before and during the commission of the crime). Thus, the in-court identifications were admissible and dismissal of the indictment is not warranted (*United States v Crews, supra*). Because we cannot say that there is no reasonable possibility that the admission of the tainted evidence of the showups did not contribute to the defendant's conviction, rendering the error harmless (*Chapman v California,* 386 US 18; *People v Crimmins,* 36 NY2d 230), a new trial is ordered. Bracken, J. P., Brown and Niehoff, JJ., concur.

Weinstein J., dissents and votes to affirm the judgment, with the following memorandum: I cannot agree with the majority's conclusion that the detention of defendant and his companion and their removal, in a police car, to the scene of the robbery some 10 blocks away constituted a *de facto* arrest. In my view, the encounter between defendant and police was more susceptible to classification as a detention for purposes of investigation rather than as an arrest. The majority's holding improperly loses sight of the fact that probable cause is not an essential predicate for all encounters between police and citizens in the course of a criminal investigation (see *United States v Mendenhall,* 445 US 544, reh den 448 US 908). The Supreme Court has afforded recognition to the fact that some seizures involving detention of persons, while admittedly covered by the Fourth Amendment, constitute such limited intrusions upon the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as the police have an articulable basis for suspecting criminal activity (*Michigan v Summers,* 452 US 692, 699). It is well settled that "until an actual arrest occurs, the Constitution demands only that the action of the police be justified at its inception and reasonably related in scope and intensity to the circumstances surrounding the encounter" (*People v Finlayson,* 76 AD2d 670, 674, mot for lv to app den 51 NY2d 1011, cert den 450 US 931; see, also, *Terry v Ohio,* 392 US 1, 20; *People v Cantor,* 36 NY2d 106, 110-111). The rationale underlying *Terry v Ohio (supra),* and its progeny is based in part upon a

recognition of the need of law enforcement officers for an intermediate response to suspicious circumstances, short of arrest, as an invaluable tool in the investigation and prevention of crimes (*Kolender v Lawson,* 461 US 352, 362, 103 S Ct 1855, 1862, concurring opinion of Justice Brennan). In sum, an individual's right "to be free from an official interference by way of inquiry" is not absolute (*People v De Bour,* 40 NY2d 210, 217). ¶ In the instant case, defendant and his companion were first stopped by the police on the basis of a general description given by the victim and an eyewitness. Although a third-party bystander unsuccessfully attempted to identify the two males as those she had previously seen running from the general area of the crime, the police placed them in a police car and transported them back to the scene of the crime some 10 blocks away. By characterizing this as an arrest, the majority has, in my view, failed to distinguish between an intrusion which amounts to an outright seizure of the detainee and an encounter, such as the one at bar, which intrudes upon no constitutionally protected interest. There is no evidence in the record that defendant's detention was inherently coercive. He was transported only a short distance and was neither physically searched nor interrogated during the ride. There was no suggestion of threats, intimidation or physical restraint. Although the police may well have prevented defendant from leaving, this had not been communicated to defendant. It has been held that the subjective intention of an officer to detain a suspect is irrelevant except insofar as it is conveyed to said suspect (*United States v Mendenhall, supra,* p 554). Nor does the fact that the police did not expressly inform defendant that he was free to decline to cooperate with them connote that a seizure had been effected (*United States v Mendenhall, supra,* p 555). ¶ The question of whether a defendant is in custody at a particular point in time is generally an issue of fact (*People v Albro,* 52 NY2d 619, 623; *People v Travis,* 87 AD2d 898, 899). It does not constitute custody for purposes of receiving *Miranda* protection (see *Miranda v Arizona,* 384 US 436) where a defendant, who is a suspect but who has not been placed under arrest, voluntarily submits to interrogation at a police station (*California v Beheler,* 463 US __, __, 103 S Ct 3517). Nor is the brief interrogation by police of defendants at their own homes regarded as custodial in nature (*People v Claudio,* 85 AD2d 245, affd 59 NY2d 556; *People v Munro,* 86 AD2d 683). Even a police interview of extended duration has, under appropriate circumstances, been deemed noncustodial (see *People v Johnson,* 91 AD2d 327, 330). ¶ The mere fact that an encounter between police and a defendant has as its setting a law enforcement vehicle does not, in and of itself, render the situation inherently custodial (see *United States v Burke,* 700 F2d 70). It has been held that "a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment' " (*Oregon v Mathiason,* 429 US 492, 495). ¶ "[I]t neither serves the interests of society nor advances constitutional values for our courts to strive for ways to permit criminals to go free in the absence of evidence that the police have, in fact, engaged in any misconduct" (*People v Finlayson,* 76 AD2d 670, 682, *supra*). To characterize each and every street encounter between a citizen and the police as a seizure would constitute an unrealistic restriction upon a wide variety of otherwise acceptable law enforcement techniques. To so restrict law enforcement officers without concomitantly enhancing any interest secured by the Fourth Amendment is, in my view, unconscionable. Accordingly, I vote to affirm the judgment of conviction.