THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
WILLIE LEE KIRBY, Appellant.

Second Department, January 20, 1987

### APPEARANCES OF COUNSEL

*Matthew Muraskin (Michael J. Obus* and *Kenneth Rabb* of counsel), for appellant.

*Denis Dillon, District Attorney (Anthony J. Girese* and *Marea M. Suozzi* of counsel), for respondent.

### OPINION OF THE COURT

KOOPER, J.

At approximately 7:20 P.M. on March 23, 1983, Police Officers Connaughton and Hess responded to a radio transmission of a burglary in progress at 39 Lakeside Drive, Roosevelt, a residential home. The report gave no description of any suspect.

Upon their arrival at that address, the officers were informed by the woman who lived there that she had just arrived at home when she heard a loud crash, and suspecting that someone was inside her house, she went to a neighbor's house and called the police. The woman never saw anyone, and therefore was unable to give the police any description of the burglar. Additionally, she had not yet determined if any of her belongings were missing.

A search of the premises did not reveal any burglars, but the officers did find that a rear window on the second floor was wide open; directly beneath it in the yard below was a smashed, umbrella-type clothespole and line. Initially suspect-

ing that whoever had exited through the window would be hurt, Connaughton and Hess checked nearby yards and houses but found no one. They next drove around the neighborhood looking for suspects, but were again unsuccessful.

At this point, Officer Hess told his partner that he had seen the defendant, Willie Lee Kirby, in the vicinity of two recent burglaries. On March 10, 1983, Hess had found the defendant in a residence that he had assumed had been burglarized. On that occasion Hess brought the defendant to a neighboring house, where it was verified that the defendant had been in his own house when discovered by the police. As there was no evidence to connect the defendant to the burglary Hess was then investigating, the defendant was released. On March 17, 1983, during the course of another burglary investigation, Hess picked the defendant up and returned him to the scene of the crime to conduct a showup. No identification could be made, however, and the defendant was again released.

Solely on the strength of Hess' suspicion of the defendant, he and Connaughton decided to seek him out in the investigation. At approximately 7:40 P.M. they found him walking down a street a few blocks from his home, and some 6 or 7 blocks from the crime scene. It was their testimony that the defendant was the first person they saw in that residential neighborhood that evening. The defendant began to cross in front of the officers' car when he was about 25 or 30 feet away. According to the officers, he was at that time simultaneously attempting to stuff something under his coat.

Hess and Connaughton called the defendant over to them, and as he approached they could see a pair of jeans protruding from underneath his coat. The officers asked the defendant if the jeans were his, and he replied that they were. They then asked what was the brand name of the jeans, and defendant said that they were "Sergio Valente". Although there was some disagreement in the officers' testimony on this point, according to Officer Hess, they demanded of the defendant that he give them the jeans, and the defendant complied. Hess then discovered that the brand name of the jeans was "Gloria Vanderbilt". They did not question the defendant about the discrepancy.

Hess then attempted to radio other officers at the crime scene to request assistance and to obtain a description of any stolen property. When he was unable to reach the other officers, Hess told the defendant that there had been a bur-

glary in the neighborhood, and that he would have to return with them to the crime scene to see if the jeans could be identified. The defendant was patted down, and got in the back of the car. At the scene, the police learned that a pair of size five "Gloria Vanderbilt" jeans were missing, and the defendant was thereupon arrested and searched. The search revealed, among other things, a small quantity of marihuana.

The defendant was charged with burglary in the second degree, criminal possession of a controlled substance in the seventh degree and unlawful possession of marihuana, and moved, *inter alia,* to suppress the physical evidence recovered from him. The hearing court denied those branches of his motion which were to suppress physical evidence and statements made by him to the police on the ground that the initial stop of the defendant had been proper, and that the police had thereafter obtained probable cause justifying the detention and the transportation of the defendant back to the scene. The defendant subsequently pleaded guilty to burglary in the second degree to cover all the counts in the indictment.

■ We disagree with the conclusions of the hearing court, and reverse. We find these facts establish that a detentive stop of the defendant occurred here, and that this stop was improper because it was not supported by a "reasonable suspicion" that the defendant was committing, had committed, or was about to commit a crime *(see, People v Cantor,* 36 NY2d 106, 112; *People v De Bour,* 40 NY2d 210, 223; CPL 140.50; *see also, United States v Hensley,* 469 US 221). Reasonable suspicion requires that the police be able to articulate specific facts justifying the intrusion, and, of course, mere "[v]ague or unparticularized hunches will not suffice" for this purpose *(People v Cantor, supra* at p 113). It need hardly be said that Officer Hess' distrust of the defendant falls far short of the "articulable facts" necessary to establish a reasonable suspicion. Instead, it is clear that Hess' distrust amounted to no more than the prohibited "vague or unparticularized hunch" which cannot justify a stop. Other than Hess' hunch, the police had no information whatever tending to connect the defendant to the crime. Importantly, neither of the earlier confrontations which purportedly gave rise to Hess' suspicion resulted in an arrest. The sole objective fact that the police had when they approached the defendant was that he appeared to be putting something under his coat. However, the mere act of stuffing something in one's coat or one's pockets while walking down a street cannot be viewed as anything

more than innocuous or equivocal behavior. Under such circumstances, an individual may not be seized *(People v De Bour,* 40 NY2d 210, 216, *supra; People v Richardson,* 114 AD2d 473, 474). In this case, we note that at the time they stopped the defendant the officers were unaware that any property had been taken in the burglary, and therefore there was no basis for a conclusion that the defendant was attempting to conceal stolen goods.

In any event, it is abundantly clear that the officers did not stop the defendant solely or even primarily because his actions at that time had aroused their suspicions. The record established that the police were specifically seeking the defendant in connection with this burglary. When they found him they stopped him and searched him, as certainly there can be no other interpretation of the order to hand over the jeans. As the stop of the defendant was not based on articulable facts giving rise to a reasonable suspicion of criminal activity, it cannot be sustained.

■ We further find that this improper stop of the defendant escalated into an arrest based upon substantially less than probable cause when the police directed the defendant into the car in order to take him to the scene of the crime for a possible identification of the jeans as stolen property. The mere fact that the defendant was not told that he was under arrest at that point is, of course, not decisive as it is clear that had he attempted to leave, he would have been detained *(see, Dunaway v New York,* 442 US 200; *People v Brnja,* 50 NY2d 366, 372). Unquestionably, this was a coercive transportation rather than a consensual one. Moreover, a reasonable man in the defendant's position would have believed himself in custody. For the third time in as many weeks, the defendant found himself confronted by the same officer who had twice before taken him into custody to be subjected to identifications. The same officer now stopped him again, caused him to surrender what he was carrying, and directed him to get in the car so that the officer could, again, take him to the scene of a burglary. Under these circumstances, there is no possible conclusion other than that the defendant was effectively under arrest at that point *(see, e.g., People v Brnja,* 50 NY2d 366, 372, *supra; People v Lane,* 102 AD2d 829, 830).

Probable cause necessary to support an arrest depends upon whether it appears more probable than not that a crime has been committed *and that the defendant was its perpetrator,* for conduct equally compatible with guilt or innocence will

not be enough *(see, People v Carrasquillo,* 54 NY2d 248, 254). Here, while the police certainly had probable cause to believe that a crime had been committed, under the facts of this case, there was no cause to believe that this defendant had committed it *(see, e.g., People v Lane,* 102 AD2d 829, 830, *supra).* The mere fact that following the stop the defendant gave equivocal or contradictory answers, including his misidentification of the brand of jeans, cannot supply the requisite probable cause *(see, e.g., People v Mosley,* 68 NY2d 881; *People v Carrasquillo, supra; People v Henley,* 53 NY2d 403; *People v Richardson, supra; cf. People v Moore,* 47 NY2d 911).

Under the circumstances herein, the officers could not seize the defendant and transport him to the scene of the burglary to determine if he was in possession of any fruits thereof. The United States Supreme Court recently reaffirmed that the police cannot, "without probable cause or a warrant, forcibly remove a person from his home *or other place in which he is entitled to be* and transport him to the police station, where he is detained, although briefly, for investigative purposes * * * such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause" *(Hayes v Florida,* 470 US 811, 816; *see also, Dunaway v New York,* 442 US 200, *supra).* The fact that defendant was removed to the scene of the crime, not the police station, does not validate this detention without probable cause. Just this type of detention and transport was held invalid in *People v Battaglia* (56 NY2d 558). There, the police responded to a radio transmission of a burglary when a silent alarm was activated in a bowling alley. Arriving at the scene at approximately 5:00 A.M., the police saw the defendant returning to his car which was parked near the bowling alley. There were no other persons or vehicles in sight at the time and in response to questioning, the defendant, whose name the police recognized as that of a known burglar, stated that he had just been walking around. The defendant's pockets were bulging and as he moved the police could hear the metallic sound of loose change jangling. Based on these observations, the police detained the defendant on suspicion of burglary and took him with them to the bowling alley, where, among other things, it was discovered that a pinball machine had been broken into. That detention, although brief, was held to be improper because it was not based upon probable cause to arrest *(see also, People v Henley,* 53 NY2d 403, *supra).*

A different situation entirely is presented by the limited detention in *United States v Sharpe* (470 US 675). There, the suspicious appearance of a pickup truck and a camper trailer which were traveling together caused the drug enforcement agents to keep them under observation for some time during which the behavior of the vehicles was sufficiently unusual to warrant a stop. Although the driver of the camper trailer did pull over as directed, the pickup truck fled the scene. It was eventually stopped, but some distance away from its companion vehicle. The truck's detention for some 20 minutes until the agents questioning the persons in the camper could drive to its location was, therefore, the direct result of its driver's elusive actions and was not improper.

Finally, in certain situations an immediate transport to the scene of the crime is permissible, although based on less than probable cause, in order to carry out a prompt identification procedure *(see, e.g., People v Hicks,* 68 NY2d 234 [removal to the crime scene for identification was permitted despite the lack of probable cause to arrest]). However, such reasoning cannot be used to justify this seizure and transport as there were no eyewitnesses to the crime and consequently there could be no identification. Rather, the defendant was taken by the police solely to determine if he could be connected to the crime, and, therefore, probable cause to arrest was required *(see, People v Battaglia,* 56 NY2d 558, *supra; People v Henley,* 53 NY2d 403, *supra; see also, Hayes v Florida,* 470 US 811, *supra).* Under these circumstances, the judgment appealed from must be reversed, those branches of the defendant's omnibus motion which were to suppress physical evidence and his statements to the police granted, and the case remitted to the County Court, Nassau County, for further proceedings.

WEINSTEIN, J. (dissenting). My dissent in this matter emanates from my recognition of the need of law enforcement officers for some allowable, intermediate response to suspicious circumstances, short of initial arrest, as an invaluable tool in the investigation and prevention of crimes *(see, Kolender v Lawson,* 461 US 352, 362 [Brennan, J., concurring]). Clearly, probable cause is not an essential predicate for all encounters between police and citizens in the course of a criminal investigation *(see, United States v Mendenhall,* 446 US 544, *reh denied* 448 US 908). In certain instances, seizures involving the detention of persons, while admittedly covered by the 4th Amendment, constitute such limited intrusions

upon the personal security of those detained and are justified by such substantial law enforcement interests, that they may be made on less than probable cause provided the police have an articulable basis for suspecting criminal activity *(see, Michigan v Summers,* 452 US 692, 699). Such was the situation in the instant case in the early stages of the police encounter with the defendant. Stated succinctly, an individual's right to be free from an official interference by way of inquiry is not absolute *(People v De Bour,* 40 NY2d 210, 217).

The facts of the instant case present the not unfamiliar picture of an initial police street encounter which quickly escalated as additional information was obtained by the police in the course of their inquiry. Shortly after responding to a radio transmission of a burglary in progress on the evening of March 23, 1983, the police left the scene in order to patrol the surrounding area for possible suspects. At the scene, the police had observed an opened upstairs window with the curtain partially off and hanging out. In the backyard beneath the window was an aluminum clothesline which had been smashed. The police reasonably believed that a person had jumped out the window, that he might have been injured in a collision with the clothesline, and that he could still be in the vicinity. One of the officers then related that on three prior occasions, he had come in contact with the defendant in the immediate vicinity of a burglary which had just occurred and suggested that they ride past the defendant's residence. The officers thereafter spotted the defendant approximately 6 or 7 blocks from the burglarized premises. The defendant was approximately 25 to 30 feet away when he observed the vehicle in which the police were riding. The vehicle was unmarked and the officers were not in uniform.

As the police drew nearer to the defendant, they observed his attempt to conceal an object under his jacket. One of the officers then rolled down the car window and, addressing the defendant by name, asked to speak with him for a minute. As the defendant approached the car, the police observed the tops of a pair of jeans protruding from his jacket. When questioned about the jeans, the defendant claimed that they were his. He further stated that they were "Sergio Valente" jeans when in fact they bore a "Gloria Vanderbilt" label. In view of this inconsistency, the police continued their inquiry and demanded to know where the defendant had been coming from. The defendant claimed to have gone to Hempstead to play basketball and to have taken the bus back home all within the

span of one hour. Officer Hess, who was familiar with the local bus routes, testified that at the time of his encounter with the police, the defendant was not walking in the direction from either of the two closest bus stops on the designated route. The officers also noticed a rip in the back pocket of the trousers the defendant was wearing. Their suspicions thus logically aroused, the officers attempted to make radio contact with another police vehicle at the scene of the burglary in order to ascertain the proceeds of the crime. In view of their inability to obtain the requested information, the officers decided to return with the defendant to the scene for a possible identification of the jeans. The defendant made no objection and willingly got into the back seat of the police vehicle. Officer Connaughton did a preliminary frisk for weapons but discovered none. The defendant was not in handcuffs while being transported back to the scene.

At the scene, the defendant and Officer Connaughton remained in the police vehicle while Officer Hess entered the premises and ascertained from a fellow officer and the complaining witness that a pair of size five Gloria Vanderbilt jeans with rolled up cuffs were missing. Inasmuch as the jeans in the defendant's possession precisely matched the description of the missing jeans, the defendant was placed under arrest. A search of defendant revealed the following items: a clear plastic bag containing a small amount of a substance which appeared to be marihuana, what appeared to be marihuana cigarettes, a 1943 silver Liberty half dollar, and a small tinfoil envelope containing a whitish substance which appeared to be cocaine. Only then was the defendant handcuffed.

Based on this set of facts, I conclude that the denial of suppression was in all respects proper. The crucial factor in assessing the reasonableness of a police-initiated encounter with a private citizen is "whether or not the police behavior can be characterized as reasonable which, in terms of accepted standards, requires a balancing of the interests involved in the police inquiry" *(see, People v De Bour,* 40 NY2d 210, 217). Ascertaining the reasonableness of the police conduct requires a weighing of the government's interest in the detection and apprehension of criminals against the encroachment involved with respect to an individual's right to privacy and personal security *(People v Cantor,* 36 NY2d 106, 111). "The proper balance of these competing interests lies in eliminating any arbitrary element in the practice" *(People v Ingle,* 36 NY2d 413, 419).

Applying these principles to the instant case, I am of the view that the police officers legitimately approached the defendant for the purpose of requesting information. The police observed the defendant walking down the street approximately 6 or 7 blocks from the scene of the burglary under investigation within a short time after their receipt of the initial radio transmission. The streets were otherwise vacant. Significantly, between January 1 and March 23, 1983, a minimum of 75 burglaries had occurred within a half-mile radius of the defendant's home. Moreover, the defendant was a known burglar who had served time for burglary. On three prior occasions, he had been observed by the police in the immediate vicinity of a burglary which had just taken place in the aforementioned high-crime area.

When the defendant, who knew Officer Hess from recent encounters, spotted the unmarked police vehicle in which Hess was riding, he began stuffing an object under his jacket in an apparent attempt to conceal it. On these facts, the police officers involved in investigating the burglary were perfectly justified in invoking their common-law right to stop the defendant and make investigative inquiries of him. While courts have acted to curtail this power when it has been exercised solely on the basis of vague suspicion or as a means of harassment *(see, People v Cantor,* 36 NY2d 106, 114, *supra),* the instant situation clearly involved more than that. The defendant's furtive conduct and the fact that the encounter occurred in a neighborhood notorious for burglaries and in close proximity to the recently reported burglary constituted the "objective credible reason" forming the police predicate in the instant case *(see, People v De Bour,* 40 NY2d 210, 223, *supra).* Moreover, the encounter was totally devoid of harassment or intimidation and did not subject the defendant to a loss of dignity. An evaluation of the police action in light of all the foregoing circumstances reasonably leads one to conclude that "rather than being whimsical it was reasonable" *(People v De Bour,* 40 NY2d 210, 220, *supra).*

Nor does the record bear any indication that the defendant was in custody prior to his actual arrest. The officers did not approach him with their weapons drawn, nor was there any suggestion of threats or of physical or constructive restraint. The officers never suggested to the defendant that he was compelled to answer their questions or that he was not free to leave. No claim was made that the defendant protested the questioning or that he asked to be permitted to proceed on his

way (see, People v Joy, 114 AD2d 517, 520). Inasmuch as the defendant was not subjected to a custodial interrogation, suppression of the subject statements was properly denied.

In assessing the over-all reasonableness of police conduct, a court is obliged to consider not only the information which police initially have but also the information gathered as events unfold (People v Chapman, 103 AD2d 494, 496). After receiving an affirmative response to their question of whether the defendant owned the pair of jeans he was attempting to conceal underneath his jacket, the officers observed that the subject garment was in fact a pair of women's jeans bearing a "Gloria Vanderbilt" label. The officers then observed a tear in the defendant's pants consistent with a fall on an aluminum clothesline and proceeded to inquire where he was coming from. Upon receipt of the defendant's patently disingenuous responses, the police were justified in entertaining a reasonable suspicion that the defendant had committed a crime and were therefore entitled to stop and detain him (see, CPL 140.50 [1]). They were also justified, at that point, in performing a brief protective frisk of the defendant (cf. People v Meachem, 115 AD2d 370, 372; People v Richardson, 114 AD2d 473, 474). It bears noting at this juncture that a person who is frisked is not necessarily thereafter in custody, as a matter of law, for the purpose of administering Miranda warnings (see, People v Morales, 65 NY2d 997, 998).

It is of no significance that the officers chose to bring the defendant to the scene of the crime rather than have the complaining witness brought to the defendant while he remained on the street. The circumstances involved here are patently distinguishable from those of People v Lane (102 AD2d 829, appeal dismissed 63 NY2d 865) where the majority of the court found that the transportation of the defendant back to the crime scene for a showup was without probable cause and was without his consent. In the instant case, the defendant offered no objection to the short ride back to the scene. The atmosphere was noncustodial in the sense that he was neither handcuffed, nor had the officers drawn their weapons or otherwise threatened the use of force. It is additionally significant to note that the defendant was not taken to the police station and that the total time and distance involved were very brief. The prompt inspection of the jeans by a person at the burglarized premises was the least intrusive method of ascertaining whether or not the defendant possessed stolen property (see, People v Rivera, 74 AD2d 653,

654; *see also, United States v Sharpe,* 470 US 675). Pursuant to the reasoning of the Court of Appeals in the recent decision of *People v Hicks* (68 NY2d 234), the prompt transportation of the defendant to the scene was of value to the interests of both law enforcement and the defendant inasmuch as it was a minimally intrusive means of investigation that was likely to confirm or dispel suspicion quickly. While the defendant might, alternatively, have been momentarily detained where the police accosted him and the witness was brought to him, such a procedure would have entailed securing the defendant and arranging transportation for the witness, a possibly more time-consuming process. Under the circumstances, the detention, including the movement of the defendant, clearly fit within the concept of reasonableness. To conclude otherwise is, in my view, to indulge in the sort of "unrealistic second-guessing" recently condemned by the United States Supreme Court *(United States v Sharpe,* 470 US 675, 686, *supra).*

In sum, the police officers, acting in a swiftly developing situation, pursued the least intrusive alternative available in briefly detaining the defendant until information regarding the proceeds of the crime could be obtained. Based upon the defendant's presence some six blocks from the crime scene, his furtive conduct in stuffing the jeans inside his jacket, his ripped pants, his patently false responses concerning ownership of the jeans and his recent whereabouts and the complaining witness' disclosure that a pair of jeans precisely matching the description of the jeans in the defendant's possession was missing from the burglarized premises, the officers had probable cause to arrest the defendant. Under the totality of the circumstances, I conclude that "the action of the police was justified at its inception and * * * was reasonably related in scope to the circumstances which rendered its initiation permissible" *(People v Cantor,* 36 NY2d 106, 111). Inasmuch as the physical items seized were uncovered during a search incident to a lawful arrest, they were properly ruled admissible.

I note in concluding that "it neither serves the interests of society nor advances constitutional values for our courts to strive for ways to permit criminals to go free in the absence of evidence that the police have, in fact, engaged in any misconduct" *(People v Finlayson,* 76 AD2d 670, 682, *lv denied* 51 NY2d 1011, *cert denied* 450 US 931). To restrict law enforcement officers in the proper exercise of their duties without concomitantly enhancing any valid interest secured by the 4th

Amendment is unconscionable. Accordingly, I vote to affirm the judgment of conviction.

MOLLEN, P. J., and BROWN, J., concur with KOOPER, J.; WEINSTEIN, J., dissents and votes to affirm the judgment appealed from with an opinion.

Presiding Justice Mollen has been substituted for the late Justice Gibbons (see, 22 NYCRR 670.2 [c]).

Ordered that the judgment of the County Court, Nassau County, rendered March 6, 1984, is reversed, on the law, the defendant's guilty plea is vacated, those branches of the defendant's omnibus motion which were to suppress physical evidence and statements made by him to the police are granted, and the matter is remitted to the County Court, Nassau County, for further proceedings.