THE PEOPLE OF THE STATE OF New York, Appellant, v DAVID HILL, Respondent.

First Department, March 5, 1987

**APPEARANCES OF COUNSEL**

*Sherrill R. Spatz* of counsel *(Susan Corkery* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Kevin F. Casey* of counsel *(Philip L. Weinstein,* attorney), for respondent.

## OPINION OF THE COURT

SANDLER, J. P.

The People appeal from an order of the Supreme Court granting defendant's motion to suppress a loaded gun, which defendant threw to the ground while fleeing from uniformed police officers who had approached him and others in order to investigate a shopkeeper's complaint that defendant and two others were about to commit a crime. The gun was the basis of an indictment charging defendant with criminal possession of a weapon in the third degree.

On April 10, 1985, at 8:00 P.M., Police Officers Humberg and Cursio, patrolling in a marked police car, received the following radio transmission: "Suspicious occupied auto, 566 Amsterdam—566 Amsterdam. It seems that they're casing a store in front of Heads-U-Win, black car, license number 699ZGY, occupied by three. Complainant is owner of the store".

Responding to the complaint, the officers saw the car described in the communication parked outside the shop, a beauty parlor. The car was unoccupied. The police left their vehicle and walked toward the beauty parlor. People inside the shop motioned towards the street corner, where defendant and another man were standing, looking at the police. A third man was leaning against a building.

The two officers walked towards the defendant, his companion and the third man. As the officers approached, the defendant and the person standing with him started running westbound on 87th Street toward Broadway. The officers shouted, "Police stop" and pursued the two men along Broadway. At 86th Street, defendant separated from the other person and headed east. The police followed defendant because "he was going away from the scene and he was a lot slower".

At 86th Street and Amsterdam Avenue, the defendant began to slow down and stagger. At that point, he pulled out a gun, turned to look at the police officers, threw the gun on the ground and ran south on Amsterdam Avenue. Officer Cursio apprehended defendant while Officer Humberg retrieved the gun. With Officer Humberg's assistance, defendant, who was swinging at Officer Cursio, was subdued and arrested.

In a thoughtful opinion, and notwithstanding Trial Term's expressed belief that the officers had acted reasonably, Trial

Term granted defendant's motion to suppress the gun upon the view that the result was required by the decision of the Court of Appeals in *People v Howard* (50 NY2d 583, *cert denied* 449 US 1023) and a group of decisions by this court.

Undeniably, from the standpoint of the authorities as they existed at the time of Trial Term's decision, the issue presented by the facts in this case was a close one. Whatever doubts as to the appropriate resolution of the question may reasonably be thought to have existed at the time of Trial Term's decision have been resolved by the later decision of the Court of Appeals in *People v Leung* (68 NY2d 734), a case presenting essentially the same issue that is presented here. The decision of the Court of Appeals in *Leung* makes it now clear that the officers were justified in pursuing the defendant when he fled, and in arresting the defendant after he had discarded the gun.

To fully understand the dispositive significance of the *Leung* decision *(supra)* in this case, it is necessary first to set forth the relevant parts of the court's decision in *People v Howard (supra).* In *Howard,* two plain-clothes officers in an unmarked vehicle observed the defendant carrying what appeared to them to be a woman's vanity case, and looking in their direction in what they considered to be a furtive manner. The officers drove to where the defendant was walking and, as the car came parallel to defendant, an officer displayed his police shield and said "Police Officer. I would like to speak to you" (at 583). The defendant ignored them and continued to walk. The officers followed, and one of them, repeating the same words, began to get out of the car. The defendant started to run and was pursued by the officers and a civilian at the scene. At a point when the defendant was closely pursued by the civilian, he threw the vanity case into a pile of junk. He was restrained by the civilian until the officers arrived, retrieved the vanity case, which was not within defendant's reach, and opened it, revealing a .38 caliber revolver and glassine envelopes. The defendant was then arrested.

A majority of a closely divided Court of Appeals held that the defendant's motion to suppress the contents of the vanity case should have been granted. The majority opinion agreed (50 NY2d, at 590) that the officers' request for information from the defendant was justified, but found that the circumstances did not make permissible any greater level of intrusion, the officers, at the time they made their inquiry, having "no information that a crime had occurred or was about to

take place, had not seen defendant do anything criminal, and were confronted only by facts susceptible of innocent interpretation". Under these circumstances, the majority concluded that although the police had a right to make an inquiry, "defendant had a constitutional right not to respond." *(Supra,* at 590.) The court went on to say (at 591-592): "Nor can the failure to stop or co-operate by identifying oneself or answering questions be the predicate for an arrest absent other circumstances constituting probable cause".

Agreeing that the police had a right to continue their observations providing that they did so "unobtrusively and do not limit defendant's freedom of movement by so doing", the court concluded that where the circumstances do not justify a detentive stop pursuant to CPL 140.50 (1), "flight, like refusal to answer, is an insufficient basis for seizure or for the limited detention that is involved in pursuit" *(supra,* at 592).

What becomes clear from a study of the *Howard* opinion *(supra),* particularly when considered in light of the later *Leung* opinion *(supra),* is that the Court of Appeals did not assert in *Howard* that the flight of someone questioned under the circumstances presented may not, as a matter of experience and judgment, give rise to a reasonable suspicion that the fleeing person had committed, was committing, or was about to commit a crime. Rather, the principle stated by the majority in *Howard* was that it would impermissibly derogate from the constitutional right of a defendant not to cooperate when questioned under circumstances not justifying a detentive stop, to permit his flight after police inquiry to make "permissible any greater level of intrusion." (50 NY2d, at 590.) Not presented in *Howard,* and therefore not addressed, was the question as to whether the police would have the right to pursue a person who fled upon observing police officers approach him, but before any inquiry was made of him of a kind that would invoke his "right not to respond". That issue was squarely addressed by the Court of Appeals in *Leung,* under circumstances that are legally indistinguishable from those presented here.

In *Leung (supra),* plain-clothes officers in an unmarked vehicle observed the defendant pass to a companion a 3 by 5-inch brown envelope, which appeared to them to resemble " 'three dollar bags' " used in drug transactions. (68 NY2d 734, 735, *supra.)* The officers approached the defendant and identified themselves, whereupon the defendant fled, with the officers in pursuit. During his flight, the defendant discarded

first a hat and then was seen to throw a black object under some bushes. One of the officers apprehended him some five houses from where the pursuit began. The black object that he had thrown away was found to be a loaded pistol.

The court's opinion (68 NY2d, at 736) preliminarily referred to its prior decision in *People v De Bour* (40 NY2d 210), in which there had been "set forth a synopsis, representing the gradation of permissible police authority in encounters with citizens in public places, that correlated the degree of the officer's objectively credible belief with the permissible scope of his intervention * * * The present case presents a situation wherein the level of police intrusion was an appropriate response to the observations and beliefs of the officers involved."

The court went on to say *(supra,* at 736):

"Although in exiting their unmarked car and identifying themselves as policemen the officers may have intended to seek explanatory information from defendant, or to detain him, there is no evidence that, prior to defendant's flight, the police did anything more than approach him. The fact that defendant passed what appeared to be a 'three dollar bag' in a neighborhood known for its drug activity constitutes, at the least, the 'objective credible reason' necessary to support the intrusion attendant to a police approach of a citizen * * * When coupled with defendant's immediate flight upon the officer's approach, the passing of the manila envelope in this narcotics-prone neighborhood establishes the necessary reasonable suspicion that defendant had committed, or was about to commit a crime, such that pursuit by the officers was justified *(see, People v Howard,* 50 NY2d 583, 592; *People v Corrado,* 22 NY2d 308, 313-314; *compare, People v McRay,* 51 NY2d 594, 604 [glassine envelopes]).

"Given that the initial approach and the subsequent pursuit and detention of defendant constituted legitimate, justifiable police conduct, manifestly the recovery of the gun discarded during flight was also lawful."

Turning to the facts presented on this appeal, we think it unnecessary to determine whether or not under all the circumstances presented the police officers would have had the right to make a detentive stop of the defendant and his companions as they approached them, following the confirmatory gesture of those inside the beauty parlor who directed the officers to the street corner at which the defendant and the

others were standing. At a minimum, the information in the possession of the officers provided the " 'objective credible reason' necessary to support the intrusion attendant to a police approach of a citizen" (68 NY2d, at 736). As in *Leung,* "there is no evidence that, prior to defendant's flight, the police did anything more than approach him." *(Supra,* at 736.)

Accordingly, when coupled with the immediate flight of the defendant and his companion upon the officers' approach, the information set forth in the radio communication and attributed to an identified person, the observation of the car described in the communication at the scene, and the confirmatory motion of those inside the beauty parlor towards the corner on which the defendant and the others were standing, established the necessary reasonable suspicion that defendant had committed, or was about to commit a crime, "such that pursuit by the officers was justified" (68 NY2d, at 736).

The single circumstance that might arguably be thought to present a possible distinction in this case from *Leung (supra),* is that the officers did not have an objective basis at the time they approached the defendant and the others for believing that they were the specific persons meant to be embraced in the motion towards the corner by those inside the beauty parlor, other individuals being present in that direction. Whether or not the officers would have had an "objective credible reason" for singling out the defendant and the others for inquiry if the officers had reached them prior to their flight, an issue not necessary for us to decide, it is surely clear that they had the right to walk in the direction indicated by the occupants of the beauty parlor. We perceive nothing in *Howard (supra),* or in *Leung* that would deny the officers the right to make the commonsense inference from the flight of the defendant and his immediate companion, in whose direction they had been motioned by the occupants of the beauty parlor, that they were 2 of the 3 persons referred to in the radio communication.

Accordingly, the order of the Supreme Court, New York County (Kristin Booth Glen, J.), entered July 30, 1985, granting defendant's motion to suppress a gun, should be reversed, on the law, and the motion to suppress should be denied.

CARRO, J. (dissenting). My disagreement with the majority stems not from its statement of the law but from its application of the law to the remarkably sparse facts upon which the police officers predicated their hot pursuit of defendant. In my

view, the police officers' response was unwarranted given the paucity of information pursuant to which they acted and given their failure to observe first hand any evidence of criminality. It is axiomatic that judicial review of the legality of police conduct involves weighing "the interference such conduct entails against the precipitating and attendant conditions known to the police as the encounter unfolds" *(People v Leung,* 68 NY2d 734, 736). Consequently, proper judicial review requires that a court not gloss over marked deficiencies in the information known to the police in order to justify police conduct which, no matter how well intentioned, falls short of constitutional standards.

The contents of the radio transmission which precipitated the encounter between Police Officers Humberg and Cursio and defendant bears repeating: "Suspicious occupied auto, 566 Amsterdam—566 Amsterdam. It seems that they're casing a store in front of Heads-U-Win, black car, license number 699ZGY, occupied by three. Complainant is owner of the store". Proceeding to the location, at around 8:15 P.M., the officers saw the described car, then unoccupied, in front of the Heads-U-Win hair salon. As Humberg approached the salon, people inside motioned towards the corner of 87th Street, which was approximately 60 to 70 feet away from the hair salon. On this evening, there were people walking up and down the sidewalk and a number of people standing on the corner. The officers' attention, however, was directed at defendant and another black male on the corner, who reportedly were looking at the officers. Among the unspecified number of other persons on the corner, the officers also noticed a third black male leaning against a building.

As the officers approached the corner, defendant and the black male standing near him ran west on 87th Street, towards Broadway. The officers pursued the men, ordering them to stop. When the men ran in different directions, the officers continued their pursuit of defendant, as he was the slower of the two. When the officers were within 30 feet of defendant, defendant staggered and threw a gun to the ground. Humberg picked up the gun, while his partner grabbed defendant. The entire chase and capture took less than a minute.

Pursuit of a person who flees after having been approached by the police for investigatory purposes is justified only when reasonable suspicion exists that the person has committed or was about to commit a crime. *(People v Leung,* 68 NY2d, at 736; *People v Howard,* 50 NY2d 583, 592.) As to what consti-

tutes reasonable suspicion, the Court of Appeals has written that it "is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand * * * To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice * * * Nor will good faith on the part of the police be enough to validate an illegal interference with an individual" *(People v Cantor,* 36 NY2d 106, 112-113).

The facts known to the police officers herein, in combination with their limited observations at the scene, simply did not establish the necessary reasonable suspicion that defendant had committed or was then about to commit a crime. Beginning with the radio transmission itself, it is abundantly clear that no evidentiary foundation for it was ever established. All that can safely be concluded is that the hair salon owner thought his establishment was possibly being cased for a robbery. Yet, it is unknown what behavior by the three persons prompted the store owner to make such a conclusion. There is no information as to whether the store owner had any prior experience or training which would lend reliability to his conclusions. Nor did the officers seek information from the store owner to establish whether his assumptions had any basis in fact or were merely the product of perhaps unreasonable fear or even prejudice. The only fact confirmed was that the car described in the radio transmission was found in front of the hair salon, but unoccupied. However, this fact adds very little, since the police had no information by which to connect the car to defendant, and the car's presence did not indicate anything about the conduct or intentions of the persons who had earlier occupied it.

Nor did the motioning by persons inside the hair salon to the corner, where numerous people were gathered, supply the officers with the necessary specific and articulable facts and information which would justify a conclusion that defendant, along with the black male standing next to him and a third black man leaning against a building were the subject of this unparticularized and unverified complaint.

The radio transmission made no mention of the race, sex, height, weight, dress or physical characteristics of the three suspicious persons. Except for the fact that defendant and the male next to him happened to look at the officers—a reaction certainly conducive to a number of innocent interpretations,

especially given that the appearance of uniformed officers in any neighborhood is bound to elicit a host of reactions ranging from curiosity to anxiousness to mistrust—there are no facts to explain why the police narrowed their focus of inquiry to these persons as the subjects of the radio transmission. Other people were on the corner and more were walking along the sidewalk. It is not even known whether, when the persons in the store motioned towards the corner, they could actually see from the store who was on the corner. It may be that they had merely seen the three suspicious occupants of the car head towards the corner sometime earlier.

Nevertheless, despite the fact that the officers operated on what I can only conclude was a vague, unparticularized hunch that these three black men on the corner were the subjects of the unverified radio transmission, it is argued that this, in combination with the flight of two of the men, gave rise to a reasonable suspicion that these men had committed or were about to commit a crime. To conclude that the flight of two men, who were not specifically linked to the conclusory, unconfirmed, sparsely detailed radio transmission, nevertheless, when combined with this transmission, established reasonable suspicion of their criminality, invites decisions based on hunches and speculations, as opposed to articulable and objective facts, overlooks the generally accepted principle in this State that the use of evidence of flight to establish consciousness of guilt results in a very weak species of evidence *(People v Moses,* 63 NY2d 299, 308), and undermines the constitutional underpinnings of a citizen's right not to answer questions or be forcibly detained absent reasonable suspicion.

While in *People v Leung (supra)* the Court of Appeals acknowledged that defendant Leung's flight was a factor in establishing reasonable suspicion, that decision does not support the extent to which the majority herein relies on flight to establish reasonable suspicion of this defendant's criminality. The facts of *Leung* themselves indicate the importance of maintaining a proper perspective on the significance of flight relative to other more probative factors which establish criminality, especially given the obvious tension in balancing a citizen's constitutional right to remain silent and free from unreasonable detentions against the weak probative value of flight as evidence of guilt.

In *Leung,* plain-clothes police officers patrolling an area known for narcotics activity observed defendant engage in conversation with another person and pass to that person a 3

by 5-inch manila envelope typically used in drug transactions. *(People v Leung,* 68 NY2d, at 735.) As part of a rapidly unfolding, unbroken chain of events, the officers stepped out of their car and identified themselves, at which point the defendant immediately fled. *(Supra.)* The differences between *Leung* and the instant case are as remarkable as is the paucity of evidence upon which the officers herein acted. In *Leung,* the officers actually observed what a trained undercover officer patrolling a drug-prone area could reasonably and prudently believe was an illegal drug transaction. That the officers then immediately turned their attention to defendant would lead any reasonably prudent person standing in defendant's shoes to believe that his activity had been seen, rendering reasonable the supposition that defendant Leung fled as the result of his consciousness of guilt.

The facts of *People v Lopez* (94 AD2d 627) also bear noting. In that case, the police officers observed defendant in the process of running away, carrying what appeared to be a woman's pocketbook, continually looking behind him and finally crouching behind a parked car and peering over his shoulder. These observations, highly suggestive of the conclusion that defendant had just committed a robbery or theft, coupled with his quick departure upon hearing the patrol car's siren and observing the police officers, did support a finding of reasonable suspicion sufficient to justify defendant's detention. *(Supra,* at 627-628.) Again, the flight was part and parcel of an ongoing series of acts actually observed by the officers, which independent of the flight, were highly suggestive of criminal behavior.

This, however, is not the case here where the basis for the store owner's conclusion that his shop was being cased was never revealed, the officers made no firsthand observations of behavior suggestive of criminality, aside from the very weak and ambiguous evidence of flight, and the two men who fled were never specifically linked to the radio transmission, except by a gesture from inside the store directed at the corner. Also, contrary to the direct connections in *Leung (supra)* and *Lopez (supra)* between defendants' flight and the immediately preceding suspicious behavior observed by the police, the flight here was much more ambiguous and equally explicable as a reaction to the not uncommon fear many members of minority groups have of police officers about to approach them. The fact that only two men fled, although three were reported to have been engaged in suspicious behavior, also

detracts from any attempt to link the persons who fled to the radio transmission.

In short, the flight added very little to the incredibly sparse information available to the police officers, and together with that information did not create a reasonable suspicion of criminality and did not warrant the police pursuit. The weapon having been seized as a direct result of that pursuit, it must be suppressed as the fruit of the poisonous tree, absent a showing of intentional abandonment unrelated to the chase. *(People v Howard, supra,* at 593.) Because the People's claim, on appeal, that defendant abandoned the weapon was not argued below, that claim is not reviewable here *(People v Johnson,* 64 NY2d 617, 619, n 2), nor does it have merit. *(See, People v Torres,* 115 AD2d 93, 99.)

Accordingly, the order of the Supreme Court, New York County (Kristin Booth Glen, J.), entered July 30, 1985, granting defendant's motion to suppress the gun, should be affirmed.

SULLIVAN, ROSENBERGER and WALLACH, JJ., concur with SANDLER, J. P.; CARRO, J., dissents in an opinion.

Order, Supreme Court, New York County, entered on July 30, 1985, reversed, on the law, and the motion to suppress denied.