■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CLEMENTIN ALLEN, Appellant.—Judgment of the Supreme Court, Bronx County (Elbert Hinkson, J.), rendered January 7, 1986, convicting defendant, after trial by jury, of two counts of robbery in the first degree and sentencing him, as a second felony offender, to two concurrent terms of 10 to 20 years, is affirmed.

Four armed male blacks, one of whom was defendant, robbed Ms. Stephanie Wyche and Mr. Carlos Escudero at 365 East 184th Street at about 11:20 to 11:30 P.M. on December 2, 1984. At about 11:25 P.M., three police officers, on anticrime patrol in an unmarked car, received a radio report of a robbery in progress at that address. The perpetrators were described as four male black individuals armed with two guns apiece. The location was 4 or 5 blocks from where the officers were at that time. As these police officers approached the location, they saw defendant and three other black men running away from the direction of the reported robbery, crossing the Grand Concourse. When the four men reached the other side of the Concourse, at the corner of Field Place, they "slowed down" or "milled about". Once the officers exited and identified themselves as police, all four scattered and ran in different directions.

The defendant ran into an alley, chased by Officer Maher. Instead of following defendant into that alley, apprehensive for his safety, the officer called for uniformed backup and waited for the help. When the assistance arrived, he went into the alley. Defendant was wedged between a chimney and a wall about four feet off the ground. Officer Maher pulled defendant from this perch by his shirt. It was too dark at that point for the officers to see a gun which was stuck in defendant's belt. Nevertheless, concerned for their safety, Maher and the accompanying uniformed officer handcuffed defendant before taking him out of the dark alley into a brighter area where they could search him and begin an inquiry. At this point, however, defendant, without prompting, spontaneously declared, "I'll cooperate, I'll cooperate". He went on to say

that he and the others had gone to "rip off" a dealer or a "cheeba house" but that they "ripped off" a lady instead. As they left the dark alley where defendant was found, into a "more lit" alley, the officers discovered the gun in defendant's belt (which upon closer inspection was found to be an imitation pistol). Defendant was placed in a police car and given his *Miranda* warnings and thereafter made two additional postarrest admissions, one to Officer Maher and one to a Detective Murphy.

Although the dissent characterizes the radioed description here as "only * * * 'four black men' ", when the police received the radio report of a robbery in progress and an identification of the culprits as four black men armed with two guns each, they observed defendant with the other three men "[n]ot even a minute, seconds" after that report. These four black men were running from the direction of the robbery, *with no other persons on the street.* A police officer, as the dissent concedes, even in the absence of any concrete indication of criminality, may approach a private citizen on the street for the purpose of requesting information where there is "some articulable reason sufficient to justify the police action" *(People v De Bour,* 40 NY2d 210, 213). The officers here had more than a sufficient predicate for inquiry, "a founded suspicion that criminal activity [was] present" *(supra,* at 215), to justify an initial stop of these four men. Thus, in *People v Benjamin* (51 NY2d 267, 270), it was held that a radio report of " 'men with guns' " at a specified location would give officers the common-law right to inquire and, when considered in conjunction with other supportive facts, could support a reasonable suspicion justifying intrusive police action.

The dissent recognizes that the police had ample grounds to approach the men in order to request information. However, it justifies defendant's flight (and the flight of the others) since the officers' command of "[s]top, police" when they exited the car, "was an aggressive, threatening approach". However, the police acted reasonably in approaching this running group of four, the only such group in the area on a late fall-early winter night close to midnight. When the four men stopped, then ran as the police simply identified themselves without drawing their weapons, the police officers were justified in considering that flight as an escalating factor, when coupled with the observation of defendants running from the direction of a crime, and the radio description. These factors justified

pursuit by the officers *(People v Leung,* 68 NY2d 734, 736; *see also, People v Hill,* 127 AD2d 144).

*People v Howard* (50 NY2d 583), cited by the dissent in support of the proposition that pursuit was not justified, is inapposite. As pointed out by this court in *Hill (supra,* at 147), the Court of Appeals did not address, in *Howard,* the question of whether the police would have the right to pursue a person who fled upon observing the police approach but *before* any inquiry was made which would invoke his " 'right not to respond' ". That exact issue, also present here, was, however, addressed in *People v Leung (supra),* where the court found that the initial approach and the subsequent pursuit and detention of defendant were legitimate and justifiable. Likewise, in this case, defendant and the others did not exercise their "right not to respond", which may have precluded further police pursuit. Instead of so doing, they took flight immediately upon the police approach.

The flight, the description in the radio report, the observations on the Grand Concourse and the attendant circumstances of the hour of night, lack of persons on the street, etc., gave rise to a reasonable suspicion that defendant and the three others were indeed the four individuals who had, moments before, committed the armed robbery, and justified the chase of defendant by Officer Maher *(People v Leung, supra).*

That the officers were not engaged in a "fishing expedition", but did have such a reasonable suspicion, is confirmed by Officer Maher's wait at the alley for backup before going in to detain and question defendant. At this point, when the officer prevented defendant from scaling a wall and put handcuffs on him, he was simply securing his own safety and that of his fellow officer. He was maintaining the status quo until additional information could be obtained *(People v Chestnut,* 51 NY2d 14, 22, *cert denied* 449 US 1018). When Officer Maher pulled defendant to the ground and handcuffed him after a struggle, he did not arrest him. Even in the absence of probable cause, the nonarrest detention of an individual, and even transportation to the crime scene for possible identification, is within the bounds of a lawful investigatory stop *(People v Hicks,* 68 NY2d 234). At that point, before *any* questions were asked of him, defendant spontaneously admitted the robbery, thus giving the officer probable cause for arrest.

Even if there was no probable cause for defendant's arrest, his statement to Detective Murphy was purged of any illegality by the context in which it was made. Thus, defendant

called out to the detective, whom he knew from past arrests, and without being asked about the specifics of this crime, told him that the police had "grabbed" him for a robbery he had committed with others, but that he had only used a fake gun. Thus, the statement here was "acquired by means sufficiently distinguishable from the arrest to be purged of the illegality" *(People v Conyers,* 68 NY2d 982, 983).

The motion to suppress the statements and the physical evidence as the products of an illegal arrest was denied, *inter alia,* by Justice Elbert Hinkson, elected from The Bronx, sitting in the Bronx County Courthouse located on the Grand Concourse. In an oral decision, he aptly summarized the facts and law: "I make the following conclusions of law: as to the defendant Allen's arrest—while it is true that flight from police inquiry in and of itself is not sufficient ground for police intrusion it may be a contributory factor in determining probable cause * * * The officer knew there was a robbery involving four male blacks armed with guns. They observed four male blacks running from the general direction of the robbery. It was late at night with no other persons on the street. When the police approached the four men split up and ran. The defendant Allen not only ran but ran to a dark alley and attempted either to scale a wall or climb out of sight. All of these factors taken together and placed in a rapidly changing scene clearly justifies Police Officer Maher's action in detaining defendant Allen." Concur—Ross, J. P., Asch and Wallach, JJ.

Milonas and Rosenberger, JJ., dissent in a memorandum by Rosenberger, J., as follows: The issue in this appeal is whether the police had reasonable suspicion that appellant and three other black men, whom they observed running across the broadest boulevard in the county on a winter night, were the perpetrators of a robbery reported to be "in progress" nearby, based on a radioed description of the perpetrators only as "four black men" in a borough in which nearly a third of the population is black.

At about 11:30 P.M. on December 2, 1984, three police officers of the Street Crime Unit were patrolling in plain clothes in an unmarked car driving along the northbound service lane of the Grand Concourse, past East 183rd Street. They received a radio report of a robbery in progress at 365 East 184th Street which described the perpetrators as four black males armed with two guns each. No other descriptive information was given. Moments after hearing the transmission, as their car approached Field Place, several blocks south

and west of the crime scene, the officers saw four black males emerge from Field Place, and run west across the Grand Concourse, a thoroughfare with wide sidewalks, 12 auto lanes and two medians. The four men, who appeared to be together, as there was no one else in the area, slowed down when they reached the opposite side of the boulevard. They stopped when they reached the corner.

Upon seeing the four black men run in front of their unmarked car, the officers made a U-turn at the corner of 184th Street and headed back toward them. "When we reached the corner of Field Place on the west side of the Grand Concourse", one of the officers testified, "we attempted to apprehend them." The officer conceded that, at that point, he had no reason to suspect that appellant had committed a crime, other than the fact that appellant, a black male, was apparently in the company of three other black men some blocks from where a robbery was reported to be "in progress."

The three police officers got out of their car and approached the four men. As they did, they identified themselves by yelling, "Stop, police", whereupon the four ran in different directions. Appellant ran into an alley, was apprehended and handcuffed.

Appellant argues that he was arrested without probable cause and that the statement he made, to the effect that he and others had meant to rob a drug dealer but had mistakenly robbed a lady instead, should therefore be suppressed. In response, the People do not contend that there was probable cause for an arrest; instead, avoiding the question of probable cause, they argue that the act of handcuffing was not an arrest, but merely an incident of a forcible stop and detention pursuant to CPL 140.50. The arrest, they argue, was not made until appellant was removed from the alley and placed in the police car, i.e., not until after he made the inculpatory statement putting the existence of probable cause beyond dispute. The People also argue that the police, in pursuing appellant, were attempting to accomplish no more than they had a right, indeed a duty, to do by reason of the radio run and their observations, namely, a temporary detention of appellant for questioning. The act of handcuffing appellant, the People maintain, was no more than a reasonable precaution, akin to the frisk permitted by CPL 140.50 (3). It was allegedly warranted by the potential danger of the encounter with a possibly armed felon in a dark alley, as well as by appellant's resistance, slight though it was, when the police pulled him down from the wall.

Quite obviously, the People prefer to frame the issue in terms of whether there was a stop rather than an arrest since the reasonable suspicion standard applicable to a stop is less exacting than the probable cause standard applicable to an arrest *(People v De Bour,* 40 NY2d 210, 223 [1976]; *People v Torres,* 115 AD2d 93, 97 [1st Dept 1986]).* The degree of intrusion that elevates a stop into an arrest is difficult of delineation *(People v Chestnut,* 51 NY2d 14, 20 [1980]; *see also, People v Hicks,* 68 NY2d 234, 239-240 [1986]), but I find it unnecessary to engage in any such line drawing here. This is because, even accepting that the act of handcuffing was only a stop, I cannot agree that the police encounter with appellant was at any stage supported by reasonable suspicion. Consequently, pursuit and seizure were not justified *(People v Howard,* 50 NY2d 583 [1980], *cert denied* 449 US 1023; *People v Greene,* 135 AD2d 449 [1st Dept 1987]).

The description of the perpetrators given in the radio report as four black men armed with guns was insufficient as a factual predicate for the officers' belief that the four black men they immediately espied in their path were the perpetrators. At best, their observations, conjoined with the radio report, justified only an inquiry as to the group's activities on the street *(People v Benjamin,* 51 NY2d 267, 270 [1980]; *People v Stewart,* 41 NY2d 65, 69 [1976]).* The police must have "a founded suspicion that criminal activity is afoot" before a stop "to gain explanatory information, but short of a forcible seizure" is warranted *(People v De Bour, supra,* at 223; *People v Harrison,* 57 NY2d 470, 475-476 [1982]).* The behavior of the four in running across the street and then stopping on the opposite corner was not suggestive of criminal activity. Thus, the officers were justified only in approaching the men to request information which, at that point, the men were under no obligation to provide *(United States v Mendenhall,* 446 US 544 [1980], *reh denied* 448 US 908; *Davis v Mississippi,* 394 US 721, 727, n 6 [1969]; *People v Howard, supra).*

Nevertheless, the arresting officer admitted, the police decided not merely to question, but to apprehend appellant and the others immediately upon seeing them. Without awaiting any evidence of unlawful activity, the police acted on that decision based solely on the fact that here were four black men in a predominantly nonwhite area where a robbery was reportedly in progress. Alighting from their unmarked car in civilian clothes, they attempted to apprehend the men by yelling, "Stop, police". This was an aggressive, threatening approach and appellant, who was not legally obliged to answer

questions or to remain, chose, for whatever reason, to depart the scene.

In *People v Torres (supra,* 115 AD2d 93, 97), this court held a seizure to be unlawful where there was "absolutely no basis for connecting defendant to the radio run or to any other suspected crime." In the *Torres* case, the defendant did not match the radioed description of the drug seller and, as here, the reference to lookouts, possibly armed with guns, provided no information tying the defendant to suspected criminal activity. We affirmed the defendant's right, under the circumstances, not to answer the officer's questions and to walk away, noting that this conduct was "certainly conducive to the innocent interpretation that [the defendant] did not want to be involved in a possibly volatile and dangerous situation" *(supra,* at 97; *compare, People v Carrasquillo,* 54 NY2d 248, 253 [1981] [police approach for purposes of a street inquiry described as "commendably relaxed"]).

Appellant's flight did not have the effect of raising the level of permissible intrusion from that of inquiry, founded upon a belief that criminal activity was afoot, to that of pursuit and seizure founded upon a reasonable suspicion that appellant had committed the robbery. To be distinguished are *People v Leung* (68 NY2d 734 [1986]) and *People v Hill* (127 AD2d 144, 146 [1st Dept 1987]), where indications of criminality observed by the police prior to giving chase were much less susceptible to innocuous interpretation. Here, the police seizure of appellant could only have been based on his presence in the general vicinity of the crime scene, his race, and his flight—facts which, taken together, did not amount to reasonable suspicion justifying pursuit.

The seizure of appellant being unlawful, the statement he made immediately upon that seizure should be suppressed. And, as that statement was the predicate for appellant's arrest, the imitation pistol and jewelry recovered from him upon the search made incident to that arrest should also be suppressed. So too should the subsequent statements made by appellant in the police car, first to Officer Maher and then to Detective Murphy, notwithstanding the prior reading of *Miranda* warnings. The statement to Officer Maher to the effect that appellant's gun was fake but that the others had "new, real ones" followed in such close sequence and was so clearly responsive to the seizure of the imitation pistol as to make it apparent that the statement would not have been made had the imitation pistol not been seized. Thus, it cannot be said that the statement was "acquired by means sufficiently distin-

guishable from the arrest to be purged of the illegality." *(People v Conyers,* 68 NY2d 982, 983 [1986]; *see also, People v Bethea,* 67 NY2d 364, 368 [1986]; *People v Milaski,* 62 NY2d 147, 156-157 [1984]; *People v Stewart,* 41 NY2d 65, 70, *supra.)*

As to the statement made to Detective Murphy, it was not, as the People argue, simply an attempt by appellant to downplay his role in the robbery in the hope that his immediate cooperation in identifying accomplices would secure him favorable treatment. Appellant did not ask Detective Murphy for a deal of any kind, and the statement appears rather to have been a cry for help by a frightened man. I also agree with appellant that the spontaneous identification of him by Ms. Wyche at the precinct immediately after his unlawful arrest was the direct result thereof, and thus should also have been suppressed. *(People v Lane,* 102 AD2d 829, 831 [2d Dept 1984]; *People v Gregory,* 90 AD2d 506 [2d Dept 1982].) However, as the court found an independent basis for the identification of the appellant by Ms. Wyche, there is no impediment to an in-court identification by her of the appellant.

By reason of the foregoing, I would reverse the judgment of the Supreme Court, Bronx County (Elbert Hinkson, J., at suppression hearing, trial and sentence), rendered January 7, 1986, convicting appellant, upon a jury trial, of two counts of robbery in the first degree and sentencing him, as a second felony offender, to two concurrent indeterminate terms of imprisonment of from 10 to 20 years each, grant the motion to suppress and remand the matter for further proceedings.