OPINION OF THE COURT
Richard A. Goldberg, J.
Defendant, along with a codefendant,[1] is accused of committing a gunpoint robbery of a milkman, Jerry Brunette, on September 13, 1991 as he and his helper, A1 Fleming, were making a delivery to Public School 308. Shortly after the crime, defendant was spotted, pursued and captured by four police officers who had been given a description of the robbers. During the chase, defendant discarded a gun, which was immediately recovered. Defendant was identified by both complaining witnesses at lineups that same day.
Pursuant to defendant’s omnibus motion, a combined Wade, Mapp and Dunaway hearing was granted. At the hearing held by this court on October 16, 1992, the court received the testimony of Police Officer Michael Staffieri, Police Officer Steven Zolga and Detective Patricia Tufo. After evaluating the proffered testimony and the exhibits admitted into evidence, the court makes the following findings of fact and conclusions of law:
FINDINGS OF FACT
On September 13, 1991, Police Officers Staffieri and Scharfberg were in plain clothes, working anticrime patrol in an unmarked automobile in Brooklyn. In the late morning of that day, they received a radio report concerning the robbery of a milk truck driver. The officers were directed to meet him at the corner of Macon Street and Reid Avenue. When they arrived, the driver, Jerry Brunette, told them that he had been robbed at gunpoint at a school on Gates Avenue between Stuyvesant and Lewis Avenues while making a milk delivery. Mr. Brunetto described the robbers as two black males, the one with the gun being approximately six feet tall, 18 years old, wearing a black hooded sweatshirt and black pants. The other man was approximately five feet seven inches tall, wearing a multicolored jogging suit and a baseball cap. During this conversation, Police Officers Zolga and Woods, also in *274 plain clothes, arrived at the scene. Mr. Brunetto told the officers that after the robbery his assailants had run into the housing project at 720-770 Gates Avenue across the street from the school. Police Officers Staffieri and Scharfberg then went to the rooftop of the three- to five-story high housing project to look around while Brunetto and Fleming continued on their delivery route.
From the rooftop, Officers Staffieri and Scharfberg spotted four or five men at a bench in the courtyard in the back of the project. One of them appeared to fit the description of the gunman given by Jerry Brunetto. They radioed Officers Zolga and Woods to rendezvous with them and when all four officers were together on the ground, they entered the courtyard and approached the men. As the officers approached, and before anything was said, the defendant, who was approximately 18 years old, six feet tall, wearing black pants and a navy blue hooded jacket began to run, tossing a silver handgun to the ground. All four officers gave chase. The gun was recovered during the chase by Police Officer Zolga and shortly thereafter, at 11:53 a.m., the defendant was arrested.
The defendant was brought to the 81st Precinct where Detective Tufo then made arrangements for lineup identifications by Jerry Brunetto and A1 Fleming. She obtained five fillers from a nearby men’s shelter. The defendant chose to take seat number one. When Mr. Brunetto and Mr. Fleming arrived at the precinct, they were kept in a room apart from the defendant and the fillers. Jerry Brunetto viewed the lineup first and identified number one, Lamont Burrell, as the man who had put a gun to his head in the vestibule of the school and taken money from him. Mr. Brunetto was then taken out and put in a separate room from A1 Fleming. Mr. Fleming then came in and he also identified number one, Lamont Burrell, as the same man who had pulled a gun on the street and chased his partner, Jerry Brunetto, into the school vestibule.
CONCLUSIONS OF LAW
The defense raises two familiar themes in arguing for suppression. The first is that the police pursuit of Lamont Burrell was unlawful and, therefore, the evidence flowing from that pursuit must be suppressed. The second is that the lineup was unfairly constituted, thereby suggesting to the witnesses that they should pick the man seated in the first seat, Lamont Burrell.
*275 In the landmark case of People v De Bour (40 NY2d 210), the Court of Appeals attempted to balance the conflicting interests of a civilian’s right to privacy and freedom from harassment, against a police officer’s obligation to prevent crime and apprehend criminals. Cognizant of the inherently intimidating nature of a police uniform, the Court attempted to delineate four levels of permissible police intrusion into a civilian’s freedom when police officers are engaged in their criminal law enforcement capacity. Mindful of the difficulties subsequent courts have had in determining where one level begins and the other ends, resulting in "inconsistency in the evaluation of markedly similar police encounters”, the Court of Appeals attempted to recap and clarify its holding in De Bour in the recent case of People v Hollman (79 NY2d 181, 185). An analysis of Hollman results in the following guidelines:
The first level, the right to request information, permits basic, nonthreatening questions, regarding e.g., identity, address or destination. If the individual is carrying something that would appear to a trained officer to be unusual, he can ask about that object. The request for information must be supported by an objective credible reason, not necessarily indicative of criminality.
The second level, the common-law right of inquiry, permits the officer to ask more pointed questions that would lead the person approached to believe that he or she is the focus of the officer’s investigation regarding possible criminality. At this level, a somewhat greater intrusion is permitted, such as a request to search a bag. This level is activated by a founded suspicion that criminal activity is afoot. At this level of intrusion, however, there is no right to detain or otherwise interfere with the liberty of a civilian who gives plausible reasons to the police inquiry or who even refuses to cooperate by refusing to stop or answer. Absent some additional indication of criminality, the police may not interfere with the civilian’s liberty by detaining him or her.
The third level permits an officer to forcibly stop and detain a person for a reasonable period of time in order to confirm or rebut his suspicions that the person was, is, or is about to be engaged in criminal activity. Since the civilian is not under arrest, the detention must be for a relatively short time period and be as noninvasive as possible under the circumstances. Of necessity, pursuit is permitted to effect the detention. This *276 level of intrusion is activated when a police officer has a reasonable suspicion that a particular person was involved in a felony or misdemeanor. Thus, a police officer may pursue and detain a suspect for an on-the-scene showup if he reasonably matches a description of a perpetrator given to him by an ostensibly reliable source despite the fact that the description is nonspecific, that is, it may match many people (People v Hicks, 68 NY2d 234). This level of intrusion has been codified in CPL 140.50 (1), a corollary of which is the authority to frisk if the officer reasonably suspects he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50 [3]).
The fourth level, arrest, occurs when the quantum of knowledge available to the police officer is such that he has probable cause to believe that a crime has been committed and that the person being apprehended was criminally involved in it.
Unfortunately, the rules have proven to be easier to articulate than to apply, based as they are, on subtle factual differences.
The difficulty of determining where one level begins and the other ends, particularly insofar as it relates to the first two levels, the right to request information and the right to make a common-law inquiry, was acknowledged by the Court in Hollman (supra). Despite its best efforts to reconcile conflicting case law, even Hollman concedes, "We do not purport to set out a bright line test for distinguishing between a request for information and a common-law inquiry. These determinations can only be made on a case-by-case basis.” (People v Hollman, supra, at 192.) "To some extent, then, our distinction rests on the content of the questions, the number of questions asked, and the degree to which the language and nature of the questions transform the encounter from a merely unsettling one to an intimidating one.” (People v Hollman, supra, at 192.)[2]
*277 As if it were not difficult enough to determine which of the first two levels the police were at upon encountering a civilian, the courts have reached conflicting results in assessing the extent to which a civilian’s flight from the police may constitute an elevation of the level of permissible intrusion. Obviously, if a police officer has no right to stop and detain a suspect, it is difficult to imagine what purpose would be achieved by permitting the officer to chase that suspect.
In People v Howard (50 NY2d 583), defendant was walking down a street at 1:00 p.m. in a rundown section of the Bronx noted for a high incidence of burglaries, carrying a lady’s vanity case. Police on anticrime patrol in their RMP, spotted him, made a quick U-tum and started to pull the car over to the side of the street where Howard was walking. Defendant spotted them and changed direction. As the car got closer to Howard he quickened his pace. One of the officers displayed his shield and said ” 'Police Officer. I would like to speak to you’.” (Supra, at 583.) Defendant looked directly at the officers and kept on walking. The police continued to follow him, again repeating their request to speak with him. Howard then pulled the vanity case to his chest and began to run away. The police gave chase, and with the help of a civilian, caught Howard just after he tossed the vanity case into a pile of junk. Upon retrieval, the case was found to contain a loaded .38 caliber revolver and several envelopes of heroin, at which point Howard was arrested.
In a 4 to 3 decision the Court of Appeals held that the police, while having a right to inquire of the defendant did not have the right to stop him, absent some indicia of criminal activity. Finding none, the evidence was suppressed. Interestingly, the Howard Court did, however, provide guidance in determining the weight to be given to a citizen’s flight from the police. "Defendant’s flight, had there also been indicia of criminal activity, would have been an important factor in determining probable cause[3] * * * but where, as here, there is *278 nothing to establish that a crime has been or is being committed, flight, like refusal to answer, is an insufficient basis for seizure or for the limited detention that is involved in pursuit.” (People v Howard, supra, at 592.)
Obviously, the Court concluded that a man carrying a lady’s vanity case at 1:00 p.m. in a rundown section of the Bronx did not by itself create a reasonable suspicion of criminality such as to justify detention of the suspect even when he attempted to flee. Put into the context of De Bour (40 NY2d 210, supra), the police need "reasonable suspicion” before they may pursue a citizen who flees from them. "Reasonable suspicion” is defined as: "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand.” (People v Cantor, 36 NY2d 106,112-113.)
Factors to be considered in determining if the police have reasonable suspicion include the source of the information; the location the officers find themselves in, whether high crime or not; and the behavior of the suspect, whether suspicious, furtive or innocuous. (People v De Bour, supra, at 219-220.)
In People v Leung (68 NY2d 734, supra), on virtually identical operative facts, the Court reached the opposite conclusion. In Leung, plain-clothes officers patrolling in an unmarked car in an area noted for its narcotics activity observed defendant pass a brown 3-inch by 5-inch envelope which appeared to resemble bags used in drug transactions. When the plainclothes officers exited the unmarked car and identified themselves as police officers, defendant immediately fled with the officers in pursuit. As the defendant ran, he threw a black object under some bushes. After the defendant was apprehended, the black object was recovered and found to be a loaded 9 millimeter pistol.
In denying suppression of the gun, the Court went on to state: "Although in exiting their unmarked car and identifying themselves as policemen the officers may have intended to seek explanatory information from defendant, or to detain him, there is no evidence that, prior to defendant’s flight, the police did anything more than approach him. The fact that defendant passed what appeared to be a 'three dollar bag’ in a neighborhood known for its drug activity constitutes, at the *279 least, the 'objective credible reason’ necessary to support the intrusion attendant to a police approach of a citizen * * * When coupled with defendant’s immediate flight upon the officer’s approach, the passing of the manila envelope in this narcotics-prone neighborhood establishes the necessary reasonable suspicion that defendant had committed, or was about to commit a crime, such that pursuit by the officers was justified.” People v Leung, supra, at 736.)
In People v Hill (127 AD2d 144 [1987], appeal dismissed 70 NY2d 795 [1987]), the Appellate Division, in a split decision, attempted to reconcile Howard (supra) and Leung (supra). It reversed an order of the Supreme Court which had granted defendant’s motion to suppress a loaded gun which defendant had thrown to the ground while fleeing from uniformed police officers. The officers had approached defendant and others in order to investigate a shopkeeper’s complaint that defendant and two others were "casing” the shopkeeper’s store. "Not presented in Howard, and therefore not addressed, was the question as to whether the police would have the right to pursue a person who fled upon observing police officers approach him, but before any inquiry was made of him of a kind that would invoke his 'right not to respond’.” (People v Hill, supra, at 147.) The Appellate Division found the distinguishing factor to be that Leung and Hill started running before the police took any overt action directed toward them whereas Howard did not start to run until the police continued to follow him after he ignored their invitation to speak to them as he was walking. Although there was no verbal communication from Howard to the police, the Appellate Division in Hill felt that Howard had communicated his declination to respond to the police inquiry by his actions in ignoring the police officer’s approach before he started to run and therefore the police had no further right to pursue or detain him. This conclusion, however, is inconsistent with the dicta in Howard which states: "The circumstances * * * would have justified the officers in keeping defendant under observation * * * but were not a predicate for anything more.” (People v Howard, supra, at 590.)
If the police had the right as Howard (supra) indicates, to keep the suspect under observation, what difference does it make if the suspect decides to keep on walking or to start running? Is the suspect’s refusal to cooperate (a right he clearly has under De Bour [supra]) communicated any the less if the suspect runs away before, rather than after, the police *280 say or do anything to him? It would appear that the distinction drawn by the Appellate Division in Hill (supra) is essentially irrelevant. (Cf., People v Allen, 141 AD2d 405.)
It occurs to this court that the only logical way to distinguish Howard (supra) from Leung (supra) is to conclude that a majority of the Court of Appeals in Howard felt that the factual predicate was sufficient to give the police an "objective credible reason [to approach Howard,] not necessarily indicative of criminality” (People v De Bour, supra, at 223) (level one) but that it did not rise to the level of common-law right of inquiry (level two) in that there was no founded suspicion that criminal activity was afoot. Since the encounter was only at level one, the additional factor of flight was insufficient by itself to raise the encounter to level three (reasonable suspicion).
The Court in Howard (supra) seemed clearly to be confused as to the appropriate level the encounter was at. "We have no difficulty in concluding that the officers’ request for information from defendant was justified * * * [level one] * * * we conclude that * * * the carrying * * * of a woman’s purse does not constitute probable cause [level four, an irrelevant issue in Howard].” (People v Howard, supra, at 589.) "[W]e hold that there was a sufficient basis to permit inquiry [level two]” (People v Howard, supra, at 588).
Despite its stated conclusion that there was a basis to permit inquiry of Howard, the Court went on to say however, "The officers had no information that a crime had occurred or was about to take place, had not seen defendant do anything criminal, and were confronted * * * by facts susceptible of innocent interpretation * * * in this day of unisex haircuts and clothing, the carrying of a woman’s vanity case was at best equivocal.” (People v Howard, supra, at 590.) This would seem to indicate that factually the Howard Court felt the police were at level one when they first approached Howard. This court concludes that, if indeed the result in Howard is correct, it stands for the proposition that unexplained sudden flight upon the approach of a police officer will not elevate a police-civilian encounter from level one to level three so as to justify police pursuit and detention. If the police were at level two when they approached Howard as the language of Howard seems to indicate, then Leung (supra) has effectively overruled Howard.
It appears from the foregoing that where some indication of *281 criminality already exists, the sudden, unprovoked flight of a suspect upon the approach of a police officer will raise the permissible level of police intrusion upon the liberty of a civilian from a right of inquiry to the level of reasonable suspicion such as to justify pursuit and detention. (People v Leung, 68 NY2d 734; People v Wider, 172 AD2d 573; People v Grimsley, 156 AD2d 714; People v Kimble, 153 AD2d 591; People v Hill, 127 AD2d 144; People v Jackson, 172 AD2d 561.)[4]
The law has long recognized that flight may be some evidence of guilt (cf., 1 CJI[NY] 9.16) but flight, by itself, is insufficient to establish guilt. (People v Leyra, 1 NY2d 199, 209; People v Yazum, 13 NY2d 302; People v Anderson, 99 AD2d 560.) At level one, since there is no requirement that there be evidence of criminality, flight in and of itself is not sufficient to raise a right to request information to a right to detain and therefore, to pursue (level three). However, at level two, which is based on a founded suspicion that criminal activity is afoot, a right to inquire may be raised to level three by flight, since the suspect’s actions in suddenly running away from an approaching police officer may be considered some evidence of guilt as to justify a reasonable suspicion that the suspect was criminally involved.
Despite such an amorphous set of guidelines, it becomes the obligation of the trial court to determine in the first instance, what level the police officers were at as they approached the defendant in the courtyard and in the second instance, to determine the effect, if any, defendant’s flight had in escalating the encounter from one level to the next.
Applying the law then to the facts in this case, it seems clear to this court that the police were already at level three (the right to stop and detain) when they approached the defendant in the courtyard of the housing project. Based upon their interview of known, ostensibly reliable, complaining witnesses who were in the nearby general area continuing *282 with their work, the police had probable cause to believe that a gunpoint robbery had occurred. The witnesses had provided them with a fairly detailed description of the perpetrators and the direction of their flight. The police followed the trail of the robbers into the Gates Avenue housing project which they had run into a short time before. When they observed a man in the courtyard of the project who appeared to closely match the description of the gunman given by the complainants, they attempted to approach him. Although defendant Burrell’s jacket was navy blue and not black, as described by the complainant, that slight difference in color is insignificant. In all other respects, defendant fit the description of the gunman given to the police officers. Defendant’s arrest photograph, admitted into evidence, clearly shows two long laces protruding from the collar of defendant’s jacket in the manner common for hooded sweatshirts.
It is this court’s conclusion that at that moment in time, in addition to the police officers having probable cause to believe a crime had been committed, they also had the requisite “reasonable suspicion” that the suspect, defendant Lamont Burrell, was one of the perpetrators. Since Burrell fit the description of the gunman they also knew he should be approached with caution as it was likely he was armed. Under such circumstances "a more intensive police intrusion” is permitted. (People v Be Bour, 40 NY2d 210, 225, supra; People v Green, 35 NY2d 193.) There was, therefore, legal justification to stop and detain this suspect for a brief time in order to arrange an on-the-scene showup identification, and perforce to pursue him to accomplish that end. Once defendant was seen to discard the gun, probable cause to arrest him for the crime of criminal possession of a weapon existed as well.
Even if it should be concluded that the quantum of knowledge available to the police officers was not specific enough to constitute reasonable suspicion that the suspect was the perpetrator and that, therefore, the police were only at level two (the right to inquire) as they approached defendant, the defendant’s sudden, unexplained bolting and running away before any overt police action was directed specifically at him, was sufficient, under the circumstances, to elevate level two to level three. The police had probable cause to believe a crime had been committed and sufficient information available to them to focus on the defendant as a possible perpetrator. At the very least, the police had the right to inquire and ask the defendant pointed questions. The additional element of sud *283 den, unprovoked flight upon the approach of what were obviously police officers, was enough under the circumstances to raise the permissible level of police intrusion from the common-law right of inquiry to the level of reasonable suspicion such as to authorize pursuit and detention.
When the defendant was brought back to the precinct for the lineups, he was kept in a room where he could not be seen by the complainants. Detective Tufo looked at Burrell’s physical appearance and attempted to closely approximate it in her choice of fillers. This court reviewed the photograph of the lineup which was introduced into evidence and finds that Detective Tufo was successful in her efforts. While of necessity there are differences in physical characteristics between the defendant and each of the fillers, they are all sufficiently similar in appearance such that no one, particularly the defendant, stood out as the man whom the police would want identified. Moreover, the testimony clearly established that nothing suggestive was said or done with respect to the witnesses when they came to the precinct or while they viewed the lineup. Each witness viewed the lineup separately. Mr. Brunetto, who went first, was kept separated from Mr. Fleming after he (Brunetto) was finished, so as not to influence Mr. Fleming’s identification in any way. Each man clearly and separately identified the defendant as the gunman and robber. Accordingly, the court finds that there was no suggestive police conduct. The lineup identifications as well as the prospective in-court identifications are therefore admissible.
Defendant’s motions to suppress the gun, the lineups and the in-court identifications, as the fruit of the poisonous tree and as the result of suggestive police conduct are hereby denied in their entirety.

. Shortly before the commencement of this trial, the codefendant, Rasheem Smith, pleaded guilty to robbery in the first degree implicating Lamont Burrell in this robbery. He is awaiting sentence on a promise of 2 Vs to 7 years’ imprisonment.

. Commentators have called the distinction illusory. In a recent article (Reinharz, Police-Civilian Encounters: Rethinking the Rules of De Bour’; NYLJ, Sept. 8, 1992, at 1, col 1), Peter Reinharz gives a particularly cogent analysis of the leading cases on police-civilian encounters. He contends that since a response to police questioning was not required under either of the first two levels of intrusion and since the suspect may leave without fear of arrest, detention or frisk, any attempt to differentiate between a request for information and a common-law right to inquire is a mere academic exercise. Reinharz goes on to explain why he feels the four-tiered analysis of De Bour (supra) is unworkable and suggests that Federal law in this area is a more practical approach. (Cf., California v Hodari D., 499 US 621, 111 S Ct 1547 *277 [1991].) For a thorough exploration of the divergent case law on the subject see Kamins, Search and Seizure (1991).

. This is probably a misnomer. Under the De Bour analysis probable cause only comes into play when a seizure is the equivalent of an arrest. It is not a requirement for a forcible stop or detention short of an arrest. To be consistent with De Bour (supra) this should have read "reasonable suspicion”. If on the other hand, the Howard Court meant what it appeared to say, i.e., probable cause is required to authorize a chase of a suspect (drawing a distinction between detention and pursuit, pursuit being equated *278 with arrest) then People v Leung (68 NY2d 734) must be considered to have overruled People v Howard (supra) at least to the extent that it lowers the minimum standard for a chase of a suspect to "reasonable suspicion”.

. This constant drawing, blurring and redrawing of the lines of permissible police intrusion confirms that it is virtually impossible to conclusively delineate that which by necessity varies from case to case. It may well be that the De Bour analysis, which works more clearly at levels three and four, should be discarded and replaced by the "totality of the circumstances” analysis favored by the Federal courts, when initial low-level police intrusions are analyzed. (California v Hodari D., 499 US 621, 111 S Ct 1547, supra; United States v Cortez, 449 US 411.) However, that approach has been rejected by New York. (See, People v Hollman, 79 NY2d 181,195, supra.)